UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| MICHAEL HAMPTON, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>    Defendants. | Case No. 21-cv-03058-LB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: ECF No. 27 |

### INTRODUCTION

Michael Hampton, a prisoner housed at San Quentin State Prison, died on September 25, 2020, after contracting COVID-19. His widow sued the State of California, the California Department of Corrections and Rehabilitation (CDCR), the prison, and ten officials (including the Secretary of the CDCR, the San Quentin warden, and officials responsible for medical-care policy), alleging that they knew the risks that led to a large-scale outbreak of COVID-19 at San Quentin and — through a botched transfer of at-risk inmates from the California Institute for Men (CIM) to San Quentin and a failure to use basic safety measures — caused Mr. Hampton's death. She claims (1) inhumane prison conditions in violation of the First, Eighth, and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983, (2) supervisory liability under § 1983, (3) a violation of California's Bane Act, (4) a violation of Title II of the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act of 1973, and (5) negligence. The defendants moved to dismiss on

the grounds that (1) they have qualified immunity because the plaintiffs did not plead facts establishing a constitutional violation by the individual defendants or show that the law was clearly established, (2) they otherwise have immunity under the Public Readiness and Emergency (PREP) Act, 42 U.S.C. § 247d-6d(a)(2) & (b), for their decisions about using countermeasures to COVID-19, (3) the plaintiffs did not plausibly plead a claim under the ADA or the Rehabilitation Act, and (4) statutory immunities bar the state claims. The court dismisses the claims against Ralph Diaz and the ADA/Rehabilitation Act claim without prejudice and otherwise denies the motion to dismiss because the plaintiff plausibly pleaded the claims, and fact disputes preclude finding immunity.

## STATEMENT

**1. Allegations in the Operative Complaint about the COVID-19 Outbreak at San Quentin**

The genesis of the COVID-19 outbreak at San Quentin was the transfer of 122 inmates from CIM to San Quentin on May 30, 2020. At the time, CIM had 600 COVID-19 cases and nine deaths, and San Quentin had no reported COVID-19 cases. The transferred inmates allegedly were at high risk medically to contract COVID-19, had not been screened for COVID-19 for weeks, and were packed onto buses in numbers that exceeded the capacity limits set by the CDCR. Some fell ill before they arrived at San Quentin.[1] When they arrived at San Quentin, the former CIM inmates were housed in the Badger housing unit, which allegedly had open-air cells open to a shared atrium, with common showers and a mess hall.[2] Allegedly, the seven individual defendants from CDCR and San Quentin approved the transfer of the CIM inmates and their housing at Badger: Secretary of the CDCR Ralph Diaz; CDCR Medical Director R. Steven Tharratt, M.D.; San Quentin Warden Ronald Davis; San Quentin Acting Warden Ronald Bloomfield; San Quentin CEO of Healthcare Charles Cryer; San Quentin Chief Medical Officer Alison Pachynski, M.D.; and San Quentin Chief Physician and Surgeon Shannon Garrigan, M.D.[3] The three remaining

---

[1] First Am. Compl. (FAC) – ECF No. 22 at 11 (¶ 34). Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 12 (¶ 35).

[3] *Id.* at 11 (¶ 35), 27–28 (¶ 72).

ORDER – No. 21-cv-03058-LB                    2

defendants are at CIM and allegedly approved the transfer decision too: CEO Louie Escobell, RN; Chief Medical Officer Muhammad Farooq; and Chief Physician and Surgeon Kirk Torres, M.D.[4] The complaint names the State of California, the CDCR, and San Quentin as defendants in the ADA and Rehabilitation Act claim.[5]

Within days of the transfer, 25 transferees tested positive, leading to an outbreak of COVID-19 at San Quentin and 499 confirmed cases.[6] By July 7, 2020, over 1,300 inmates and 184 staff tested positive for COVID-19.[7] By July 30, 2021, 2,181 inmates (roughly two-thirds of the prison population) tested positive.[8] By September 2, 2020, 26 inmates and one correctional officer died of COVID-19, deaths that (according to the plaintiff) were preventable.[9]

The plaintiff's claims are predicated on the botched transfer of infected prisoners from CIM and the defendants' refusal to implement basic safety measures to reduce the spread of COVID-19, which caused Mr. Hampton's death. At the time of the transfer, the defendants knew the risks of COVID-19. For example, (1) county shelter-in-place orders were in effect by March 16, 2020, (2) a state shelter-in-place order was in effect on March 19, 2020, (3) the governor declared a state of emergency on March 4, 2020, and, on March 24, 2020, suspended the intake of inmates into all state facilities for 30 days, and (4) statewide mask mandates were in place by April 17, 2020.[10] Until late May 2020, the California Correctional Health Care Services (CCHCS) opposed the transfer of inmates between prisons and said that transfer "carries significant risk of spreading transmission of the disease between institutions."[11] On March 18, 2020, the Habeas Corpus Resource Center wrote a letter to defendants San Quentin Warden Ron Davis and San Quentin's Chief Medical Officer Alison Pachynski asking San Quentin to give inmates personal-protective

---

[4] *Id.* at 27–28 (¶ 72).
[5] *Id.* at 33.
[6] *Id.* (¶ 35).
[7] *Id.* at 15 (¶ 45).
[8] *Id.*
[9] *Id.*
[10] *Id.* at 8–10 (¶¶ 28–29, 31–33).
[11] *Id.* at 10 (¶ 32).

equipment and cleaning supplies, allow for social distancing, and avoid quarantining inmates testing positive for COVID-19 in solitary-confinement cells normally used for punitive measures.[12]

On June 1, 2020, in a conference call with "Defendants, including Defendant Broomfield" (the acting warden), Marin County Public Health Officer Matthew Willis, M.D., recommended that San Quentin sequester the transferred inmates from the existing San Quentin population. Instead, San Quentin housed the transferred inmates in a shared unit with existing San Quentin inmates. Dr. Willis recommended masks for exposed inmates and correctional staff and restricting staff movement between different housing units. The defendants (presumably not the CIM defendants) knew about the recommendations, did not adopt them, and "agreed . . . [to] inform[]" Dr. Willis that local health authorities had no authority to mandate measures in the prisons. On June 3, Dr. Willis recommended that San Quentin appoint an incident commander with expertise in outbreak management. The defendants appointed one on July 3, but only after the Marin County Board of Supervisors appealed directly to Governor Newsom.[13]

CCHCS Director J. Clark Kelso is the federal receiver for California's prison medical-care system. On June 13, 2020, at his request, medical experts toured San Quentin. In a June 15, 2020, "Urgent Memo," they warned that the COVID-19 outbreak at San Quentin could become a "full-blown epidemic and health care crisis in the prison and surrounding communities" and that overcrowding and the risk factors at San Quentin created a high risk for a "catastrophic super-spreader event." There was a "grave lack of personal protective equipment and masks" for inmates, and the defendants "refused to provide adequate masks and personal protective equipment" to inmates or prison staff. Inmates had to make inadequate masks out of cloth, and both inmates and staff regularly wore no masks or wore them improperly. The defendants knew about and tolerated these problems. The experts warned that-virus testing delays (five to six days) were too long and intolerable.[14] They said that quarantine strategies of using cells otherwise used for punishment might

---

[12] *Id.* at 10 (¶ 30).
[13] *Id.* at 12–13 (¶ 38).
[14] *Id.* at 13 (¶ 39).

(1) thwart containment because inmates would be reluctant to report symptoms and (2) pose health risks to sick inmates because they would be out of the sight of medical staff and face barriers to communicating with them.[15] The experts — who met with inmates over the age of 60 with only weeks left on their sentences — reported that "[i]t is inconceivable that they are still in this dangerous environment."[16] They recommended measures to be implemented immediately, including large-scale release of inmates. The defendants knew about and chose to disregard the recommendations and — rather than release significant numbers of high-risk inmates — ordered inmates transferred to punitive housing assignments at San Quentin, including solitary confinement.[17] As a result, inmates refused to report symptoms and test so that they could avoid punitive incarceration.[18]

In March and June 2020, the defendants knew about and refused two offers by the Innovative Genomics Institute in Berkeley, California, to provide free COVID-19 testing at San Quentin, and they refused two similar offers by UCSF Medical Center in May and June 2020. Mr. Kelso, the federal receiver, testified that San Quentin and the CDCR lacked testing resources in March and April 2020 and were still unable to provide timely testing results by July 2020. Prison staff were "begging" for personal-protective equipment but "were told that to the extent San Quentin had such PPE, it was reserved for medical professionals and not frontline correctional officers and supervisors." Officers "were relegated to wearing" inmate-made or homemade masks, were not tested for COVID-19, and were not trained about or required to follow safety protocols. The defendants knew about, and actually or tacitly approved, these conditions and practices.[19]

On July 1, 2020, at a meeting held by the California Senate Commission on Public Safety, state senators called the May 2020 transfer from CIM to San Quentin "a horribly botched transfer" that reflected a "failure of leadership" that was "abhorrent," a "fiasco," and "completely avoidable." Mr. Kelso testified that "what we've done to date still is not enough," and Dr. Mark

---

[15] *Id.* at 13–14 (¶ 40).
[16] *Id.* at 14 (¶ 41).
[17] *Id.* at 10 (¶ 30), 14 (¶ 41).
[18] *Id.* at 14 (¶ 41).
[19] *Id.* at 14–15 (¶ 42).

Ghaly, who heads California's Health and Human Services Agency, said "[t]here is no dispute that more could be and should be done."[20]

On July 6, 2020, Mr. Kelso fired defendant R. Steven Tharratt, M.D., the CDCR Medical Director.[21] In August 2020, defendant Ralph Diaz, the Secretary of the CDCR, announced his retirement.[22]

On October 20, 2020, the California Court of Appeal issued its opinion in *In re Von Staich*. 56 Cal. App. 5th 53 (2020); *review granted and request for depublication denied sub nom.*, *Von Staich on H.C.*, 477 P. 3d 537 (Cal. 2020) (Court of Appeal must vacate its decision and consider whether disputes of facts require an evidentiary hearing before it pronounces judgment). The Court of Appeal's holdings were as follows: (1) the warden and the CDCR acted with deliberate indifference to the rights and safety of San Quentin prisoners; (2) public-health experts endorsed conclusions that inmates could be protected only if the prison released substantial numbers of inmates; (3) CDCR did not implement the fifty-percent reduction "deemed essential by the Urgent Memo solicited in its behalf by the federal receiver;" (4) the respondents "concede actual knowledge of the substantial risk of serious harm to San Quentin inmates;" (5) the failure to reduce the population was not reasonable; and (6) the continued use of congregate living spaces and double cells was reckless (not merely negligent) (given the prison's poor ventilation and inadequate sanitation) and was aggravated by the respondents' failure to consider the expedited release of prisoners who were vulnerable to COVID-19 and not likely to recidivate. *Id.* at 58, 63–64, 78–79 (cleaned up).[23]

On August 17, 2020, the Office of the Inspector General (OIG) issued the first of three reports responding to a request by the Speaker of the California Assembly for an assessment of the CDCR's COVID-19 policies. It found problems such as poor screening for COVID-19 and inadequate training. (Forty-seven percent of the screeners at San Quentin had received no training.[24]) In the

---

[20] *Id.* at 15 (¶ 43).

[21] *Id.* (¶ 44).

[22] *Id.* (¶ 46).

[23] *Id.* at 15–18 (¶ 47).

[24] *Id.* at 18 (¶ 48).

second report on October 26, 2020, it concluded that lax enforcement by CDCR supervisors and managers likely contributed to noncompliance by staff members and inmates with protocols governing face coverings and social distancing.[25]

On February 1, 2021, the OIG released its third report, titled *California Correctional Health Care Services and the California Department of Corrections and Rehabilitation Caused a Public Health Disaster at San Quentin State Prison When They Transferred Medically Vulnerable Incarcerated Persons from the California Institution for Men Without Taking Proper Safeguards*. The OIG characterized the efforts to prepare for the transfers as "deeply flawed and risked the health and lives of thousands of incarcerated persons and staff." CCHCS insisted on a tight transfer deadline, resulting in the CIM's ignoring the healthcare staff's concerns and transferring medically vulnerable persons who had not been tested for COVID-19. According to emails, a CIM healthcare executive ordered that incarcerated persons not be retested the day before the transfers, and "multiple CCHCS and departmental executives were aware of the outdated nature of the tests before the transfers occurred." The risks were exacerbated by the "inexplicable decision" to increase the numbers of persons on the buses. When inmates arrived at San Quentin, two were symptomatic for COVID-19, but all were housed in one unit with air circulation that flowed throughout the unit. By the time the prison tested them, the inmates had been housed together for at least six days, and the virus had spread quickly among them. The prison could not quarantine them, leading to the spread of the virus throughout the prison.[26] Given that CIM nurses questioned the transfer on grounds of patient safety and the lack of COVID-19 precautions, the OIG concluded that "[t]he decision to transfer the medically vulnerable incarcerated persons despite such outdated test results was not simply an oversight, but a conscious decision made by prison and CCHCS executives."[27]

Also on February 1, 2021, Cal-OSHA cited the CDCR and San Quentin with fourteen violations (including five serious violations and four "willful-serious" violations), including a lack

---

[25] *Id.* at 18–19 (¶ 49).
[26] *Id.* at 19–20 (¶ 50).
[27] *Id.* at 19–21 (¶¶ 50–51).

of training, testing, proper personal-protection equipment, legally required respirators at least as effective as N95 respirators, soap in an employee restroom, policies to prevent airborne transmission and other decontamination policies, and appropriate transfer and housing policies to address the risk (whether within or outside of the facility).[28]

As discussed above, seven defendants (at the CDCR and San Quentin) allegedly personally approved the transfer of the CIM inmates and their housing at the Badger housing unit, and the remaining three medical defendants at CIM allegedly approved the transfer too. All allegedly knew about the risks surrounding the transfer and outbreak.[29] Again, as discussed above, on March 18, 2020, San Quentin Warden Ron Bloomfield and Chief Medical Officer Alison Pachynski, M.D., received letters about personal-protection equipment, cleaning supplies, and social distancing.[30]

## 2.  CDCR Submissions About its Response to the Pandemic

In 2006, in *Plata v. Newsom,* No. 01-cv-01351-JST, a Northern District judge appointed a federal receiver to administer the CDCR to ensure compliance with the Eighth Amendment's standards for medical care. *Hines v. Youseff*, 914 F.3d 1218, 1223 (9th Cir. 2019). According to the receiver's testimony at the July 1, 2020, hearing held by the California Senate Commission on Public Safety (referenced in the complaint and summarized in part above), the CDCR began planning its response to the pandemic in February 2020 and took preventative measures by March 11, 2020, but COVID-19 numbers spiked anyway by May 2020. The CDCR spent weeks considering whether it could move CIM patients safely to the prisons at Corcoran and San Quentin. It had a screening-and-testing matrix for patient movement that required a negative test (but did not specify the timing of the test, which meant that some tests were two, three, and four weeks old, meaning, too old to be reliable). The prison at Corcoran managed the outbreak pretty well, but San Quentin did not, in part based on serious resource deficiencies in the physical plant, COVID-19

---

[28] *Id.* at 21–22 (¶ 52).
[29] *See, e.g., id.* at 3–7 (¶¶ 6–19).
[30] *Id.* at 10 (¶ 30).

support, and testing, which contributed to the rapid spread of the virus.[31] In a May 27, 2020, joint case-management statement submitted by the CDCR and the *Plata* plaintiffs, the CDCR said that "the Receiver, in conjunction with the Secretary [of the CDCR], has directed that high-risk inmates who test negative for COVID-19 be transferred to institutions that remain COVID-free."[32]

### 3. Mr. Hampton's Death

The CDCR refused to provide Mr. Hampton's custody records, which have information about his COVID-19 infection and medical treatment, and thus some information in the complaint about his medical condition is based on knowledge and belief.[33] (At the hearing on its motion to dismiss, the CDCR agreed to provide the records.)

The defendants had to have known about Mr. Hampton's high-risk factors for COVID-19 including age (62), obesity, hypertension, hyperlipidemia, prediabetes, and sleep apnea.[34] By early June 2020, Mr. Hampton had symptoms consistent with COVID-19. On June 24, 2020, he submitted a Healthcare Services Request Form, writing, "I've had a constant cough for a couple of weeks now all night long — it doesn't stop — could you give me something for this cough please." By June 26, his symptoms had worsened, and he complained of a cough, a loss of his senses of taste and smell, a loss of appetite, and shortness of breath, and he told San Quentin medical staff that he had not eaten in three days due to vomiting. (He spoke on the phone with his wife (the plaintiff) around this time and was coughing badly.) Shortly after the call, the prison transferred him out of the Main Block housing unit and into the Badger unit, where San Quentin housed inmates with COVID-19 symptoms. Two days later, the plaintiff learned through a phone

---

[31] Kelso Test., Ex. E to Request for Judicial Notice – ECF No. 27-2 at 140–45 (pp. 58–63). The court judicially notices the testimony referenced in this order for completeness and under the incorporation-by-reference doctrine. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

[32] J. Case-Management Statement, *Plata v. Newsom*, No. 01-cv-01351-JST (May 27, 2020), Ex. C to *id.* – ECF No. 27-2 at 54 (p. 14). The court judicially notices the public-record statement (but not disputed facts in it) and recounts the statement for the fact that it was said, not for the truth of disputed facts. *Lee v. Cty. of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).

[33] FAC – ECF No. 22 at 22 (¶¶ 53–54).

[34] *Id.* at 26 (¶ 63).

ORDER – No. 21-cv-03058-LB                 9

call with another inmate that Mr. Hampton had been moved for treatment. She believes that he spent the two days without medical attention. She did not hear from anyone for about a week and a half, when she finally reached a liaison, who told her that Mr. Hampton had been transferred to a hospital but would not provide additional information.[35]

On June 27, 2020, prison staff moved Mr. Hampton to Seton Medical Center in Daly City. He arrived with COVID-19 and pneumonia, and he was in acute hypoxic respiratory distress. The defendants did not tell the plaintiff about his transfer until June 30. His health continued to deteriorate. Prison staff did not allow the plaintiff to communicate with Mr. Hampton until his condition worsened several weeks later, and he was moved to the ICU. There, she had daily video calls with him, where he told her that his fever was so high at San Quentin that he had to lie on the floor to cool off. He was placed on a ventilator on August 6, 2020, and remained there for one month, requiring a tracheostomy and a change of medication before the hospital weaned him off the ventilator. By this time, he had significant scarring on his lungs and multiple pulmonary embolisms. On September 15, 2020, he transitioned to comfort care, and on September 22, 2020, he was transferred to Kentfield Hospital for ongoing comfort care. He died three days later.[36]

Mr. Hampton was a model inmate and was eligible for release under Proposition 57, "having served 22 years for burglary, a [non-violent] crime with a maximum sentence of 6 years." His parole hearing was set in August 2020.[37]

### 4. Other Relevant Procedural History

Mr. Hampton's widow sued the State of California, the CDCR, San Quentin the prison, and ten officials for causing Mr. Hampton's death.[38] The complaint has five claims:

**Claim One**: deliberate indifference in violation of the First, Eighth, and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983 based on (a) inhumane and unsafe

---

[35] *Id.* at 22–23 (¶ 55–56).

[36] *Id.*

[37] *Id.* at 8 (¶ 26), 22 (¶ 56).

[38] *Id.* at 3–7 (¶¶ 6–19).

conditions of confinement that caused Mr. Hampton to contract COVID-19 (against the ten individual defendants) and (b) interference with the plaintiff's right to familial association when Mr. Hampton was hospitalized (against defendants Ralph Diaz, the estate of Dr. Tharratt, Wardens Davis and Broomfield, and medical officials Pachynski and Garrigan);

**Claim Two**: supervisory liability under § 1983 (against the ten individual defendants) for the alleged botched transfer and subsequent actions at San Quentin;

**Claim Three**: a violation of California's Bane Act, Cal. Gov't Code § 52.1(b) (against the ten individual defendants), for deprivation of U.S. Constitutional rights (based on the deliberate indifference and interference with familial relations), denial of timely medical information to the family in violation of Cal. Penal Code § 5022 and Cal. Prob. Code §§ 4701 and 4717, and a denial of rights secured by the California Constitution, Art. 1, § 1;

**Claim Four**: a violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act of 1973, 28 U.S.C. § 794 (against the state of California, the CDCR, and San Quentin); and

**Claim Five**: negligence (against the ten individual defendants).[39]

The court held a hearing on the defendants' motion to dismiss on November 4, 2021. All parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636.[40]

### 5. Other Cases

There are six other Northern District cases that involve San Quentin's handling of the pandemic: (1) *Plata*, No. 01-cv-01351-JST (see above); (2) *Ruiz v. California*, No. 21-cv-01832-JD (deceased inmate; represented by *Hampton* counsel; motion to dismiss pending); (3) *Legg v. CDCR*, No. 21-cv-01963-HSG (deceased inmate; represented by different counsel; partial motion to dismiss pending); (4) *Love v. California*, No. 21-cv-04095-JD (deceased inmate; represented by *Hampton* counsel; motion to dismiss filed); (5) *Polanco v. California*, No. 21-cv-06516-CRB (deceased correctional

---

[39] *Id.* at 25–37 (¶¶ 61–103).
[40] Consents – ECF Nos. 9, 25, 29, 30, 39.

officer; represented by *Hampton* counsel; motion to dismiss filed); and (6) *Warner v. California*, No. 21-cv-08154-JD (deceased inmate; represented by *Hampton* counsel; motion to dismiss filed).

## STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds on which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (cleaned up).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, which when accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 234 (9th Cir. 2020). "[O]nly the *claim* needs to be plausible, and not the facts themselves." *NorthBay*, 838 F. App'x at 234 (citing *Iqbal*, 556 U.S. at 696). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (cleaned up).

If a court dismisses a complaint, it must give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

**ANALYSIS**

The plaintiff alleges that the botched transfer defendants caused Mr. Hampton's death and claims violations of the U.S. Constitution, California's Bane Act, the ADA and Rehabilitation Act, and common-law negligence. The defendants counter that (1) they are entitled to qualified or statutory immunity because at most they made difficult decisions about how to address the virus and (2) they are immune under the PREP Act for their administration of interventions designed to address the pandemic.[41]

Preliminarily, the plaintiff's argument — articulated at the hearing — is that the nature of the decisions involving the transfer meant that the defendants necessarily (given their jobs) had the requisite knowledge about the decisions. The allegations at the pleadings stage establish that point for the decisionmakers affiliated with the relevant institutions (San Quentin and CIM). But there are no fact allegations about the personal knowledge of the Secretary of the CDCR Ralph Diaz. The court dismisses the claims against him without prejudice. The court also dismisses the ADA/Rehabilitation Act claim without prejudice and otherwise denies the motion to dismiss.

**1. Constitutional Claims: Deliberate Indifference and Supervisory Liability**

Deliberate indifference to a prisoner's serious medical needs amounts to the cruel and unusual punishment prohibited by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

For the objective prong of the deliberate-indifference test in a medical-care claim, the plaintiff "must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (cleaned up). For the subjective, or "deliberate indifference" prong, the plaintiff must show "(a) a purposeful act or failure to respond

---

[41] Reply – ECF No. 43 at 7 (summarizing issues).

to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.* (cleaned up); *cf. Farmer*, 511 U.S. at 837 (deliberate-indifference prong requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

"A defendant may be held liable as a supervisor under § 1983 if there exists either (1) [the supervisor's] personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (cleaned up); *see Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000) (supervisors can be liable for "1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others").

The plaintiffs allege sufficiently that the remaining defendants (affiliated with San Quentin or CIM) knew about the risks related to the transfer and ignored them when they authorized and executed the transfer in an obviously unsafe way. The defendants contest the facts, but that is an issue for summary judgment. Moreover, as the plaintiff points out, there is an asymmetry of information: the defendants have the decedent's custody file and possess information about the transfer decisions. Rule 8(a) does not require more under circumstances like these. In sum, the plaintiff plausibly pleads that the defendants were personally involved, failed to act, and acquiesced in the constitutional deprivation.

As to the second theory of the deliberate-indifference claim (the alleged interference with the plaintiff's right to familial association when Mr. Hampton was hospitalized), the claim sufficiently alleges the loss of familial association based on Mr. Hampton's death and illness. To the extent the plaintiff alleged a separate theory of liability for the time that she had no information about Mr. Hampton's medical condition, she cites no cases or facts that support that theory. (That context may be relevant to damages.)

The defendants also assert qualified immunity. Disputed facts preclude qualified immunity.

1  "[T]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (cleaned up). Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Under qualified immunity, an officer will be protected from suit when he or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances.'" *Id*. (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

"[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). "The doctrine of qualified immunity gives officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id*. at 1866 (cleaned up). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." *Id*. at 1867.

In determining whether an officer is entitled to qualified immunity, courts consider (1) whether the officer violated a constitutional right of the plaintiff and (2) whether that constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question. *Mattos*, 661 F.3d at 440. Courts may exercise their sound discretion in deciding which of these two prongs should be addressed first. *Id*. (citing *Pearson*, 555 U.S. at 235).

Regarding the second prong, "clearly established law should not be defined at a high level of generality," but instead "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (cleaned up). Although case law "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

The defendants' main argument is that the plaintiff's claim — the Eighth Amendment gives inmates protection from communicable diseases, including the COVID-19 pandemic — is not

sufficient to establish a clearly established constitutional right. Also, they contend that the federal receiver authorized the transfer.[42]

The facts surrounding the federal receiver's involvement are disputed. At most, the record supports the conclusion that the federal receiver was involved in the decision to transfer and is silent on his involvement on the allegedly botched transfer. Thus, qualified immunity is not warranted (though the issue may be dispositive at summary judgment).

The fact disputes also preclude the court's granting qualified immunity at the pleadings stage for the CDCR's response to COVID-19. The complaint alleges known risks from a serious communicable disease. Prison officials cannot be deliberately indifferent to inmates' exposure to serious communicable diseases. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (summarizing examples and cases).[43] *Hines v. Yousef* is distinguishable. It involved exposure to Valley Fever, a disease caused by inhaling fungal spores commonly found in the southwestern United States. 914 F.3d at 1224–26, 1229, 1232. The court found qualified immunity because no evidence suggested that involuntary exposure to the spores violated "current standards of decency" (which was relevant to the deliberate-indifference standard). *Id.* at 1231. The opinion turned in part on the accepted exposure to Valley Fever by the millions of people who live in the Central Valley, suggesting a tolerance to the risk that defeated the claim of a constitutionally impermissible risk. *Id.* at 1232. Also, Valley Fever was not communicable. *Id.* at 1224, 1229, 1232. By contrast, the allegations here are about a deliberately indifferent response to a known risk of a communicable disease (not, as the defendants assert, the lack of a "particular COVID-19 response in 2020").[44]

---

[42] Reply – ECF No. 43 at 9–10 (citing the *Plata* case-management statement referenced above, which references the decision generally but not the circumstances surrounding it).

[43] Opp'n – ECF No. 40 at 18 (collecting cases).

[44] Reply – ECF No. at 10.

### 2. PREP Act Immunity

The defendants contend that they are immune under the PREP Act for their administration of covered countermeasures to a health emergency (the COVID-19 pandemic).[45]

The PREP Act immunizes a "covered person" from "suit and liability" for claims for loss "caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure" if the Secretary of the U.S. Department of Health and Human Services has made a determination that a public-health condition or threat is (or credibly risks) a public-health emergency. 42 U.S.C. § 247d-6d(a)(1) & (b).

 The term "covered countermeasure" means (A) a qualified pandemic or epidemic product (defined elsewhere in the statute); (B) a security countermeasure (same); (C) drugs, biological products, and devices (as the terms are defined in the Federal Food, Drug, and Cosmetic Act) that are authorized for emergency use under that Act; or (D) "a respirator protective device that is approved by the National Institute for Occupational Safety and Health under [the applicable] . . . Code of Federal Regulations (or any successor regulations), and that the Secretary determines to be a priority for use during a public health emergency declared under section 247d of this title." *Id.* § 247d-6d(i)(1). "The term 'covered person', when used with respect to the administration or use of a covered countermeasure, means . . . a person or entity that is— (i) a manufacturer of such countermeasure; (ii) a distributor of such countermeasure; (iii) a program planner of such countermeasure; (iv) a qualified person who prescribed, administered, or dispensed such countermeasure; or (v) an official, agent, or employee of a person or entity described in clause (i), (ii), (iii), or (iv)." *Id.* § 247d-6d(i)(2) (formatting altered).

As the defendants acknowledge, no courts have applied the PREP Act to prisons.[46] In any event, claims based on a failure to act, as opposed to purposefully allocating countermeasures, can fall outside the PREP Act protections. *See, e.g., Estate of Heim v. 1495 Cameron Ave.*, No. 21-cv-6221-PA (ADSx), 2021 WL 3630374, at *1–4 (C.D. Cal. Aug. 17, 2021) (claims "based on

---

[45] *Id.* at 10–12 (referencing earlier arguments in the underlying motion).

[46] Mot. – ECF No. 27-1 at 18.

alleged inaction on the part of Defendants" were not necessarily barred by the PREP Act); *Stone v. Long Beach Healthcare Ctr., LLC*, No. CV 21-326-JFW, 2021 WL 1163572, at *4 (C.D. Cal. March 26, 2021) ("There is only immunity for inaction claims when the failure to administer a covered countermeasure to one individual has a close causal relationship to the administration of that covered countermeasure to another individual.") (cleaned up).[47]

At the pleadings stage, the plaintiff plausibly pleads that Mr. Hampton died because the defendants botched his transfer and did not use basic safety measures (including many that are not covered countermeasures) to reduce the risk of COVID-19.[48] Also, the plaintiff's allegations that reference covered countermeasures generally are about a failure or refusal to use them.[49] Finally, the facts are disputed about whether the defendants purposely allocated countermeasures or failed to act. The court denies the motion to dismiss.

### 3. ADA and Rehabilitation Act Claim

Mr. Hampton suffered from sleep apnea, obesity, hypertension, hyperlipidemia, and prediabetes, and he had medical issues (such as a constant cough) that — he contends — sleep apnea may have exacerbated.[50] The defendants assert that the plaintiff did not plead that Mr. Hampton's sleep apnea substantially limited major life functions or that he put the prison officials on notice of his need for accommodation.[51] Given that the defendants did not produce Mr. Hampton's custody file (and the resulting asymmetry of information), the plaintiff sufficiently pleaded his disability, and the fact issues about whether it substantially limited a major life function are better resolved at summary judgment. But the court dismisses the claim because the plaintiff did not plausibly plead that the defendants intentionally discriminated against Mr. Hampton.

---

[47] *See also* Opp'n – ECF No. 40 at 24–25 (collecting and analyzing cases).

[48] *Id.* at 22 (citing the complaint's listing of safety measures that are not covered countermeasures).

[49] *Id.* at 23 (citing the complaint's listing of failures to use available, and sometimes free, countermeasures).

[50] *Id.* at 26 (citing Compl. – ECF No. 22 at 22 (¶¶ 54–55).

[51] Reply – ECF No. 43 at 12.

ORDER – No. 21-cv-03058-LB                 18

Under Title II of the ADA, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA prohibits public entities from discriminating against the disabled and also prohibits public entities from excluding the disabled from participating in or benefitting from a public program, activity, or service "solely by reason of disability." *Lee v. City of Los Angeles*, 250 F.3d 668, 690–691 (9th Cir. 2001). "Discrimination includes a failure to reasonably accommodate a person's disability." *Sheehan v. City & Cty. of San Francisco,* 743 F.3d 1211, 1231 (9th Cir. 2014).

"To recover monetary damages under Title II of the ADA, a plaintiff must prove intentional discrimination on the part of the defendant." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). To prove intentional discrimination, the plaintiff must show defendants acted with "deliberate indifference," which "requires both some form of notice . . . and the opportunity to conform to [statutory] dictates." *Id*. at 1139 (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (O'Connor, J., concurring)). The plaintiff must identify "specific reasonable" and "necessary" accommodations that the defendant failed to provide. *Id*. "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Id*.

"[D]eliberate indifference does not occur where a duty to act may simply have been overlooked." *Id*. "Rather, in order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id*.

The two issues are whether the plaintiff plausibly pleaded Mr. Hampton's disability and the defendants' intentional discrimination.

First, she plausibly pleaded his disability. An impairment (such as sleep apnea) that substantially limits one or more major life activities (such as sleeping) can be a qualifying disability. 42 U.S.C. §

12102(1)(A) & (2)(A).[52] Relevant authority suggests that the issue in this case is better addressed at summary judgment because the substantial limitation of a major life activity turns on facts. *Phillips v. PacifiCorp*, 304 F. App'x 527, 529 (2008) (affirming summary judgment in a wrongful-termination case in favor of the employer when the former employee's diagnosed disabilities — sleep apnea and chronic-obstructive pulmonary disease — were impairments that were mitigated by her later use of a CPAP machine and oxygen; thus, during the relevant time period, she did not have an impairment that substantially limited the major life activity of sleeping).

Second, the plaintiff did not plausibly plead that the defendants intentionally discriminated against Mr. Hampton. The complaint has no facts about notice to the defendants about the disability and necessary accommodations. *Duvall*, 260 F.3d at 1138. The court dismisses the claim with leave to amend. The court does not set a deadline to amend because the forthcoming custody file and medical records likely are necessary to plead a claim plausibly. The issue of the timing of any amendment can be addressed at the initial case-management conference.

**4. State-Law Statutory Immunities**

The state claims are the Bane Act and negligence. Because facts are disputed, the immunity issues (such as whether acts were discretionary) are not resolvable at the pleadings stage.

## CONCLUSION

The court dismisses the claims against Ralph Diaz and the ADA/Rehabilitation claim against all defendants without prejudice. The deadline to amend will be addressed at the initial case-management conference). The court otherwise denies the motion to dismiss.

**IT IS SO ORDERED.**

Dated: January 21, 2022

LAUREL BEELER
United States Magistrate Judge

---

[52] Opp'n – ECF No. 40 at 26 (collecting and analyzing authorities).